## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| RAYE JONES, | ) | CASE NO. 8:05CV506 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM |
| | ) | AND ORDER |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff Raye L. Jones ("Ms. Jones"), seeks review of a decision by the
Commissioner of the Social Security Administration, Jo Anne B. Barnhart, Defendant
("SSA"), denying Ms. Jones's applications for disability insurance benefits filed under Title
II of the Social Security Act ("Act"), 42 U.S.C. §§ 401 *et seq.*, and supplemental security
income filed under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.* Ms. Jones originally filed
these applications on August 15, 2002.[1]  Social Security Transcript ("TR") at 77, 714.  The
applications were based on allegations that Ms. Jones has been unable to work since
December 7, 2000, due to chronic lower back pain, stomach problems, and depression.
TR 116.  The SSA, on initial review, denied Ms. Jones's claims on December 30, 2002.
TR 52.  Ms. Jones filed a request for reconsideration, and, after the SSA initiated another
review, Ms. Jones's request for reconsideration was denied on April 14, 2003.  TR 57.

Ms. Jones filed a request for a hearing on April 23, 2003, and that hearing was held
on April 30, 2004.  TR 62, 27.  Subsequent to that hearing, Administrative Law Judge

---

[1]Ms. Jones first filed applications on May 10, 2001; these were denied on September 13,
2001.  TR 74, 47.  Ms. Jones did not appeal that denial, but rather filed new applications on
August 15, 2002.

("ALJ"), James M. Mitchell made several findings.[2]   Those were, among others, the following:

> 3.  The claimant has an impairment or combination of impairments considered "severe" based on the requirements in Regulations 20 CFR §§ 404.1520(c) and 416.920(c).

> 4.  These medically determinable impairments do not meet o[r] medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

> . . . .

> 8.  The claimant can perform her past relevant work as an information clerk . . . .  Even if the claimant were unable to perform her past relevant work, she is able to perform other work existing in the national economy.

> . . . .

> 12.  The claimant has the residual functional capacity to perform a significant range of sedentary work (20 CFR §§ 404.1567 and 416.967).

> 13.  Although the claimant's exertional limitations do not allow her to perform the full range of sedentary work, . . . there are a significant number of jobs in the national economy that she could perform. . . .

TR 38–39.  The ALJ upheld the SSA's decision, finding that Ms. Jones was not entitled to a period of disability or disability insurance benefits, and not eligible for supplemental security income payments.  TR 39.

---

[2]Although not a separate finding, the ALJ also found the following: "[T]he undersigned finds that the claimant retains the residual functional capacity to lift, push and pull ten pound[s] occasionally and five pounds frequently.  She can walk, stand, stoop and bend occasionally. She can sit frequently.  She is moderately limited in overhead reaching with her right hand and arm.  As a result of her mental impairment, the claimant is slightly limited in her ability to maintain attention and concentration and slightly limited in understanding and memory.  She is only slightly limited in her ability to perform simple, repetitive tasks.  She experiences slight to moderate pain."  TR 36.

2

On September 20, 2005, the Appeals Council denied Ms. Jones's request for review. TR 8. Ms. Jones now seeks judicial review of her claim. This Court has reviewed the record, the ALJ's evaluation and findings, the parties' briefs,[3] the transcript, and the applicable law. For the reasons stated below, this Court concludes that the ALJ's findings are not supported by substantial evidence in the record as a whole; consequently, I reverse the findings of the ALJ and remand the matter back to the SSA for further proceedings consistent with this Memorandum and Order.

**Medical Background**

Ms. Jones, born on November 8, 1963, was defined by the applicable regulations as a "younger individual between the ages of 18 and 44" when she filed her current applications for Title II and Title XVI benefits. *See* 20 C.F.R. §§ 404.1563, 416.963. She completed high school and has two years of post-secondary education, and has past work experience as an information clerk, a certified nurse assistant, and a motel clerk. TR 27.

**1.     Physical Complaints**

Ms. Jones's abdominal complaints[4] first appear on the record in reference to an abdominal wound. This wound was the sight of a surgical incision—from a procedure that was performed in 1999—that had difficulty healing properly. TR 208. By January 12, 2000, Dr. Dennis Hatch opined that the incision was "healing nicely," but noted that there

---

[3]The Plaintiff also submitted an appendix to her brief which chronologically sets out the medical history, separated by complaint. Considering the length of the transcript in this case, that appendix was a helpful reference, and I note the effort put forth by counsel.

[4]There are two distinct stomach-related complaints on the record. The first concerns a superficial abdominal wound that was not healing properly, and the second concerns a diagnosis of gastrointestinal problems.

3

was "an odor about it." TR 174.  On January 26, 2000, the possibility of an infection was becoming more apparent, and Dr. Curtis Reimer stated that the wound showed "more of a drainage this time and [was] more brownish-red." TR 670.  On February 7, 2000, Dr. Reimer noted a "mildly infected incision." TR 670.  Dr. Reimer noted on March 9, 2000, that it appeared that the incision "popped open," and was not completely closed.  However, he stated that he did not believe there was an infection and continued to advise cleaning it with hydrogen peroxide or antibacterial soap.  TR 669.  In June of 2000, Ms. Jones visited the emergency room twice for the abdominal wound, and green and yellow drainage was noted.  220–25.

Through March of 2001, the incision continued to cause difficulties; it had reopened several weeks prior to a doctor's visit on March 14, 2001, and Ms. Jones was complaining of a foul smell coming from the wound.  TR 232.  In October of 2001, Dr. Michael Haller noted that the "wound from the umbilicus to the pubic area" was "fairly well healed," and that there was "no drainage" at that time.  Ms. Jones, however, reported some irritation to the wound.  TR 396.  In a letter dated April 2, 2004, Dr. Haller stated that Ms. Jones "did have a surgical wound that had a difficult time healing in the past, but over the past year, it has been healed and has not had any further evidence of infection or bleeding."  TR 676.[5]

Ms. Jones also alleges limitations due to gastrointestinal pain.  She visited the emergency room at Methodist Hospital for this abdominal pain on February 1, 2001, and was referred to Dr. Scott Rose.  Dr. Rose examined her on February 5, 2001, and noted

---

[5]The fact that the abdominal wound has healed does not seem to be in contention.  In her brief, Ms. Jones states that the "wound eventually healed . . . ." Filing No. 16, 8.

4

that she complained of "severe abdominal pain when she has bowel movements going from her rectum all up into her intestine." TR 444. Dr. Haller saw Ms. Jones on February 7, 2001, and referred her to a gastroenterology ("GI") specialist, Dr. Thomas McGinn. He ordered several tests, including a barium enema, which did not "demonstrate annular constricting lesions of the colon. No polyps [were] identified. The cecum and ileocecal valve area appear[ed] normal." TR 433. On June 17, 2001, Ms. Jones experienced severe abdominal pain and went to the hospital, where she stayed for five days. Upon discharge, Dr. Haller noted that her blood count was normal, her chemistry profile was normal, an X-ray of her abdomen showed gas but no bowel obstruction, and all other lab tests were normal. She also had a colonoscopy, and the results were less than satisfactory. Her final diagnosis was the possibility of a partial bowel obstruction and irritable bowel syndrom. TR 240.

Dr. Haller again saw Ms. Jones on June 28, 2001; he noted that the bowel obstruction was negative, and he attributed her abdominal pain to irritable bowel syndrome. Dr. Haller again saw Ms. Jones on July 6, 2001, and he referred her to another GI consultant, Dr. Tyron Alli. TR 414. Dr. Alli ordered several tests, including a bone scan (which came back normal, TR 408), and a CT scan of the abdomen and pelvis (which came back normal, TR 407).

The record indicates that over the next three years, Ms. Jones had several episodes of nausea and vomiting. During that time, she had several tests which indicated results in the normal range, and she was consistently diagnosed with irritable bowel syndrome.

Ms. Jones also alleges a work limitation due to chronic back pain. Having complained about lower back pain for approximately one year, on July 31, 2001, Ms. Jones

had an MRI of her lumbar spine.  That test revealed areas of desiccation of the nucleus pulposus; areas of mild Schmorl's node end plate irregularity; no significant focal protrusion or spinal stenosis; and areas of mild annular laxity.  It was further explained that these findings indicate mild degenerative changes at multiple levels.  TR 405–06.

On April 17, 2002, Dr. Haller examined Ms. Jones's musculoskeletal system.  He noted that she "stands straight without any curvature of the spine.  She has only about 45° flexion of the spine before she has pain in the spine and she has pain on both sides of the spine in the lumbar area and it also radiates down into the right gluteal area.  She has pain that radiates into her right leg.  Straight leg raising was negative."  TR 389.  He assessed her as having muscle spasms, and noted that a recent X-ray and CT of the spine showed some degenerative changes.

Two weeks later, on May 1, 2002, Dr. Haller again examined Ms. Jones for complaints of lower back pain.  Confining his exam to the musculoskeletal system, he noted that "she stands straight, without any curvature of the spine.  She is only able to flex about 45 degrees at the present time, due to pain.  She has pain with palpation over the whole entire lumbar area, but it does seem to radiate down into the right hip as well."  TR 386.  This time, Ms. Jones was assessed with a lumbosacral sprain.

After more visits to Dr. Haller with no improvement, Ms. Jones was referred to physical therapy.  TR 380.  She was admitted to physical therapy on June 11, 2002, and was discharged on July 18, 2002.  During that time, she had eleven sessions, three cancellations, and one no-show.  The objective findings were stated as follows: "The patient's active range of motion continue to be limited by reports of pain in all directions at 10% to 25% of normal limits.  Manual muscle tests were invalid secondary to patient giving

6

way or displaying submaximal effort with reports of pain during all muscle tests of the lower extremities." TR 470.

On July 19, 2002, and Dr. Haller suggested that another MRI was needed. The results were received on July 24, 2002, and showed some degenerative disk disease. However, it was noted that there had been no changes since the last MRI approximately one year prior. Dr. Haller then referred her to the pain clinic at Methodist Hospital.

At the pain clinic, on August 1, 2002, she was assessed with the following: "myofacial pain and chronic low back pain with degenerative disk disease with a radicular component." TR 498. She was given a lumbar epidural steroid injection to help with the pain. TR 499. Later that week, she visited the emergency room twice—the first visit was due to heart palpitation and severe back pain, and the second visit was due to chest pain and shortness of breath. TR 600. On August 5, 2002, she was seen by Dr. Robert Beer, who "reassured her that her lungs and heart were okay and that she was simply hyperventilating because of the pain." TR 367.

On January 6, 2003, she visited the pain clinic again, where it was noted by Dr. Mark D'Agotino that "our injections do not seem to help and the medications are equivocal at best." TR 493. On January 30, 2003, Dr. D'Agotino again noted that she had not responded to epidural steroid, and that he had no further suggestions for her. TR 489.

The record indicates that she continued to see Dr. Haller for the next two years, and was prescribed a variety of medications with no apparent consistent relief of pain. On February 7, 2004, she fell on her stomach, after which she was assessed with a muscle spasm. TR 700. She was in an automobile accident on March 10, 2004. TR 698.

7

On April 2, 2004, Dr. Haller prepared a narrative report for the disability hearing.  In it, he offered the following opinion: "Her main problem at this point in time is chronic back problem.  She has sciatica, with pain down the right leg. . . . [S]he is presently not able to sit or stand more than 15–30 minutes at a time. . . .  She is on a ten-pound weight restriction as far as lifting.  She should not stoop or bend for any prolonged period of time, and I believe that she is disabled enough at this point in time that she is unable to maintain any job for any length of time. . . . [S]he winds up in the emergency room frequently with abdominal pain and it is always a problem as to whether this is just irritable bowel or whether it is more bowel obstruction . . . ."  TR 676.[6]

For her abdominal and back problems, the record is replete with instructions to take several over-the-counter or prescription medications, including Keflex, Augmentin, Dulcolax, Magnesium Citrate, Levaquin, Demerol, Bentyl, Phenergan, Toradol, Nubain, Darvocet, Lortab, Morphine, Amitriptyline, Diazepam, Protonix, Zelnorm, Valium, Flexeril, Neurontin, Vistaril, Toradol, Reglan, Celebrex, Vioxx, Codeine, Bextra, Hydrocodone, Relafen, and Ibuprofen.

Aside from the opinions of the treating and consulting physicians who treated Ms. Jones's back and abdominal problems, three non-treating State Agency ("SA") physicians rated Ms. Jones's physical residual functional capacity ("RFC").  The first, dated September

---

[6]The ALJ noted that a medical opinion provided by a treating physician must be given controlling weight if it is well-supported by medically acceptable clinical findings and other substantial medical and non-medical evidence in the case record.  However, the ALJ discounted Dr. Haller's opinion, stating that it "is unsupported by any objective medical evidence and can only be based on the claimant's subjective complaints which the undersigned has found less than credible."  TR 34.  He also rejects Dr. Haller's findings as "unsupported, brief, and/or conclusory."  TR 34.

10, 2001, and signed by Dr. Glen Knosp, appears in the transcript at TR 263–73.  He focused on her abdominal pain and non-healing surgical incision, and did not reference any back pain in his medical consultant summary.  TR 271.  He stated that Ms. Jones can occasionally and frequently lift ten pounds, can stand two hours in an eight-hour work day, and can sit for six hours in an eight-hour work day.  TR 264.

The second physical RFC, dated February 26, 2002, and signed by Dr. Allen Hohensee, appears in the transcript at TR 280–89.  He noted that she had objective tests which demonstrated mild degenerative changes, and that the physical therapists noted marked decrease range of motion in all parameters, but that she had giveaway weakness and sub-maximal effort.  TR 289.  He opined that Ms. Jones was partially credible, and that she can occasionally lift twenty pounds, can frequently lift ten pounds, can stand for two hours in an eight-hour work day, and can sit for six hours in an eight-hour work day.  TR 281.

The final physical RFC, dated April 11, 2003, and signed by Dr. R. E. Harley, appears in the transcript at TR 516–25.  He stated that Ms. Jones's "symptoms and alleged limitations are markedly out of proportion to any demonstrated impairment.  This is supported by the minimal findings on the L/S X-ray and MRI and minimal findings and normal testing of the GI tract. . . .  It is thus felt the allegations made by the claimant regarding her physical limitations are less than credible and the only limiting impairment is her marked obesity."  TR 525.  His RFC reflected the same limitations suggested by Dr. Hohensee.  TR 517.

## 2.      Mental Complaints

Finally, Ms. Jones alleges a mental condition.  For this condition, Dr. Michael Coy first saw Ms. Jones on February 5, 2001.  After that visit, Dr. Coy diagnosed Ms. Jones with a major depressive disorder, with a rule out of anxiety disorder and panic disorder.  He rated her Global Assessment of Functioning ("GAF"), at approximately 65, and did not prescribe any medications at that time.  TR 309.  Dr. Coy again saw Ms. Jones on June 4, 2001, and noted that she was alert, pleasant, cooperative, and goal directed, with average productivity and spontaneity.  He reaffirmed his major depressive disorder diagnosis, and prescribed Wellbutrin.  TR 310.

Dr. Coy continued to treat Ms. Jones over the next three years.  Although he consistently observed that she was alert, pleasant, and cooperative, he frequently restated his diagnosis of a major depressive disorder.  He prescribed a variety of medications, including Wellbutrin, Celexa, Trazodone, Eskalith, Lithium Carbonate, Risperdal, Clonidine, Paxil, and Trileptal.  TR 300–06, 674–75.

On January 1, 2002, Dr. Coy noted that Ms. Jones was pleasant and cooperative, with average productivity and spontaneity, diagnosed an ongoing mood disorder, and rated her GAF at 50.  However, he, at that time, opined that she could be treated on an outpatient basis. TR 278.  On April 15, 2002, Dr. Coy rated Ms. Jones's GAF at 65.  TR 302.  On April 1, 2004, Dr. Coy rated Ms. Jones's GAF at 50, TR 673, and stated that she "continues to struggle with significant and chronic mental health issues that impact her day-to-day living to the point where she is unable to function.  She is unable to obtain employment due to not only her physical issues but her severe emotional issues.  She will

10

need ongoing psychiatric services throughout her life and prognosis is quite guarded in life."[7]  TR 674.

Aside from Dr. Coy, two non-treating SA physicians rated Ms. Jones's mental RFC. The first, dated December 27, 2002, and signed by Dr. John Herdman, found mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  TR 326.  Dr. Herdman noted the existence of a major depressive disorder.  TR 319.

The second, dated April 11, 2003, and signed by Dr. Lee Branham, indicated mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and insufficient evidence to form an opinion on episodes of decompensation.  TR 513.  Dr. Branham noted the existence of either a major depressive disorder or mood disorder.  TR 506.

## Standard of Review

When reviewing an ALJ decision not to award disability benefits, the district court does not act as a fact-finder or substitute its judgment for the judgment of the ALJ or the Commissioner.  *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995).  Rather, the district court

---

[7]The ALJ rejected Dr. Coy's opinion that she is unable to obtain employment, giving three reasons.  First, the ALJ opined that "Dr. Coy's comments regarding the claimant's ability to work are based on his understanding of the claimant's self-reported major medical problems."  Second, the ALJ found that the claimant's statements that led to the finding of significant and chronic mental health problems were made at a time "when she was understandably upset about events regarding her grandchildren and her residence and are, therefore, not a reliable indicator of her long-term functioning."  Finally, the ALJ noted that the statements regarding her ability to be employed are not medical opinions but legal opinions, "reserved to the undersigned."  TR 36.

11

will affirm the Commissioner's decision to deny benefits if it is supported by substantial evidence in the record as a whole. *Eback v. Chater*, 94 F.3d 410, 411 (8th Cir. 1996). Under this standard, substantial evidence means something "less than a preponderance" of the evidence, *Kelley v. Callahan*, 133 F.3d 583, 587 (8th Cir. 1998), but "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord Ellison v. Sullivan*, 921 F.2d 816, 818 (8th Cir. 1990). "Substantial evidence is that which a reasonable mind would find as adequate to support the ALJ's decision." *Brown v. Chater*, 87 F.3d 963, 964 (8th Cir. 1996) (citing *Baumgarten v. Chater*, 75 F.3d 366, 368 (8th Cir. 1996)). In determining whether the evidence in the record as a whole is substantial, the district court must consider "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).

The substantial evidence standard "allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal." *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir.1991) (citing *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). If the district court finds that the record contains substantial evidence supporting the Commissioner's decision, the court may not reverse the decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984). Rather, if it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, then the Commissioner's decision must be affirmed. *See Young*

12

*v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000) (citing *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995)).

## Discussion

Ms. Jones states that the ALJ made five errors in determining that she could sustain competitive employment. The first and third suggestions of error concern the RFC the ALJ set for Ms. Jones. Ms. Jones, in effect, argues that the ALJ failed to develop a sufficient factual record, and that the record lacks the medical evidentiary support necessary to support the ALJ's RFC determination.[8] The second suggestion of error concerns the ALJ's findings relating to Ms. Jones's mental condition - specifically, Ms. Jones disputes the evaluative method the ALJ used to assess the evidence, charging that the ALJ made improper judgements and educed incorrect inferences.[9] The fourth and fifth suggestions of error concern credibility and weight, the fourth relating to the weight given to various physicians, and the fifth relating to the credibility determination made concerning Ms. Jones's subjective complaints of pain.

---

[8]Both of these charges of error concern Ms. Jones's RFC, and are discussed simultaneously below.

[9]I find that this charge of error is overshadowed by the charge of an insufficient factual record. Because I find that the ALJ did not meet his duty to fully develop the factual record, I will not further discuss the reasons he gave, except to note that interjecting his own medical opinions to help supplement an incomplete or inconsistent medical record is not proper, and does not satisfy the duty to develop a factual record. *See Duncan v. Barnhart*, 368 F.3d 820, 824 n.4 (8th Cir. 2004) ("We note that the ALJ did not see fit to have Dr. Singh testify about any purported inconsistencies in her report. In fact, the record does not reflect that the ALJ contacted Dr. Singh at all to explain what the ALJ found to be irreconcilable differences in her report. We question whether this approach is true to the ALJ's duty to fully and fairly develop the record."); *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000) ("'An administrative law judge may not draw upon his own inferences from medical reports.'") (quoting *Lund v. Weinberger*, 520 F.2d 782, 785 (8th Cir. 1975)).

13

1.      **Record Development and Medical Support for the RFC Findings**

In general, the findings of an ALJ must be supported by substantial evidence in the record.  In particular, the Eighth Circuit Court of Appeals has characterized an RFC[10] finding as a "medical question," *Krogmeier v. Barnhart*, 294 F.3d 1019, 1023 (8th Cir. 2002), and therefore "some medical evidence must 'support the determination of the claimant's'" RFC, *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001) (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)).  "[T]he ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace," *Lauer*, 245 F.3d at 704, and is accordingly "required to consider at least some supporting evidence from a [medical] professional," *id.*  However, an RFC assessment should not necessarily be based *solely* on medical evidence, but rather should be based on all "relevant evidence." 20 C.F.R. §§ 404.1545(a), 416.945(a).  This includes observations by treating or examining physicians or psychologists, family, and friends; medical records; and the claimant's own description of her limitations.  *Id.* §§ 404.1545(a)–(c), 416.945(a)–(c); *McKinney v. Apfel,* 228 F.3d 860, 863–64 (8th Cir. 2000).

Further, it cannot be overstated that a Social Security hearing is a non-adversarial proceeding, *see, e.g., Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005), and consequently lacks the ususal rigors of the adversarial process to develop the "true facts of a case," *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004).  Therefore, even in

---

[10]RFC is defined as what the claimant "can still do despite . . . limitations."  20 C.F.R. §§ 404.1545(a), 416.945(a).

instances where the burden of persuasion remains on the claimant[11] or where the claimant is represented by an attorney, it remains incumbent on an ALJ to fully and fairly develop the facts of each case.   *See id.* (quoting *Richardson*, 402 U.S. at 410 ("The social security hearing examiner, furthermore, does not act as counsel. He acts as an examiner charged with developing the facts.")).   In other words, separate from being an adjudicator, an ALJ is to act as a neutral party, one who is charged with the task of developing the facts with no interest in the denial of benefits.

In this case, Ms. Jones argues that the record is devoid of any treating psychiatrist's opinion as to her possible mental workplace limitations, and therefore the ALJ had an affirmative duty to further develop the factual record in that regard.  Ms. Jones argues that this duty included an obligation to send the claimant out for a consultative exam (or, in the alternative, an obligation to contact her existing treating source), and an obligation to delve into her mental symptoms at the hearing.[12]

First, I note that psychiatric treatment notes, spanning over three years, exist in the record.  Dr. Coy saw Ms. Jones at least sixteen times between February 5, 2001, and April

---

[11]While an ALJ has a duty to fully develop the record, it is initially the claimant's burden "to demonstrate that [she] is unable to do past relevant work.  Only when the claimant establishes the inability to do past relevant work does the burden of proof shift to the Commissioner." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).  Accordingly, there is a difference between an ALJ failing to fully develop a record—that is, leaving a crucial issue underdeveloped—and a claimant failing to meet the requisite burden by showing that he or she is unable to perform his or her past relevant work.

[12]Ms. Jones argues, in this section of her brief, that not only was the mental RFC not supported by the requisite medical evidence (i.e., *some* medical evidence), but also asserts arguments contending that the physical RFC determination was made in error.  However, the arguments concerning the physical RFC stem from the weight determinations the ALJ gave to the various physicians (treating physicians and non-treating SA physicians), and consequently will be discussed in a later section of this Memorandum and Order.

1, 2004.  During that time, he consistently diagnosed her with a major depressive disorder, treated her with a variety of medications, and rated her GAF between 65 (indicating mild symptoms), and 50 (indicating serious symptoms).[13]  However, at no point during his treatment did he articulate specific medical reasons why she would be unable to function in the workplace.  In fact, it is not until his most recent (and arguably thorough), report that Dr. Coy first opines that "[t]he patient continues to struggle with significant and chronic mental health problems that impact her day-to-day living to the point where she is unable to function.  She is unable to obtain employment due to not only her physical issues but her severe emotional issues."  TR 674.  I note that even in stating that she will be unable to obtain employment, he does not specify the ways in which her condition limits her.

As mentioned above, the ALJ did not grant significant weight to Dr. Coy's statements.  In this regard, the ALJ was correct in finding that "statements that a claimant could not be gainfully employed 'are not medical opinions but opinions on the application of the statute, a task assigned solely to the discretion of the [Commissioner].'"  *Cruze v. Chater*, 85 F.3d 1320, 1325 (8th Cir. 1996) (quoting *Nelson v. Sullivan*, 946 F.2d 1314, 1316 (8th Cir. 1991)).  However, there is a difference between not accepting a statement as legally controlling and completely disregarding the context in which a statement was

---

[13]*See Hudson ex rel. Jones v. Barnhart*, 345 F.3d 661, 663 n.2 (8th Cir. 2003) ("[T]he Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning.' GAF scores of 41 to 50 reflect '[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).' GAF scores of 51-60 indicate '[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).'") (quoting Diagnostic and Statistical Manual of Mental Disorders 32, 34 (4th ed. Text Revision 2000)).  A GAF of 65 "indicat[es] [a person] function[s] fairly well."  *Duncan*, 368 F.3d at 824.

16

made.  Considering the lack of articulated support for Dr. Coy's assertions, the ALJ was obligated in this case to follow up with Dr. Coy or order another evaluation.  Whether the ALJ disregards the only treating mental health expert because he feels there are inconsistencies within the reports, or because he feels that the expert was continually misled by the claimant's understandable yet temporary mental incapacity, there remains a duty to develop the record fully, and failure to do so will result in a reversal and remand. This is not an instance where Ms. Jones failed to carry her burden of persuasion.  Rather, a crucial issue, indeed, the most crucial issue - whether Ms. Jones can obtain and maintain competitive employment - remains significantly underdeveloped.

## 2. Credibility and Weight Determinations

### a. Treating, Consulting, and Non-Treating Physicians

When reviewing the weight given by an ALJ to a treating physician's opinion, a district court will find error if the ALJ failed to consider or discuss that opinion and the record contains no contradictory medical evidence.  *See Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).  "The regulations provide that a treating physician's opinion regarding an applicant's impairment will be granted 'controlling weight,' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.'" *Prosch v. Apfel*, 201 F.3d 1010, 1012–13 (8th Cir. 2000) (citing 20 C.F.R. § 404.1527(d)(2)).  A treating physician's opinion is not automatically controlling—it must be assessed against the record as a whole and may be discounted if it is inconsistent with other parts of the same opinion or inconsistent with the record as a whole.  *Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir.

17

2005). Further, a physician's opinion that an applicant is disabled or unable to work is not the type of medical opinion an ALJ need give controlling weight, as it involves a legal conclusion reserved for the Commissioner. *Ellis*, 392 F.3d at 994 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004) ("[T]reating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant cannot be gainfully employed, because they are merely opinions on the application of the statute, a task assigned solely to the discretion of the Commissioner." (internal marks omitted))).

In this case, Ms. Jones argues that the ALJ erred in not granting the opinion of Dr. Haller controlling weight. Unlike the findings concerning Ms. Jones's mental limitations, the findings concerning her physical limitations are sufficiently developed. Therefore, Dr. Haller's opinion should be granted controlling weight if it is well-supported by laboratory and clinical diagnostic techniques, and it is not inconsistent with the record as a whole.

As the Defendant points out, the ALJ's RFC finding in this case is consistent with Dr. Haller's lifting, stooping, and bending limitations. The inconsistencies the ALJ found were based on insufficient objective medical findings and Ms. Jones's lack of complete credibility. I have examined the record and I agree that while many diagnostic and laboratory tests were performed, a substantial percentage of them returned with results in the normal range. Further, I agree that it appears that Dr. Haller bases many of his conclusions on Ms. Jones's own subjective complaints. If she is, as the ALJ found, less than credible, Dr. Haller's opinions lose support. The Commissioner is granted a zone of

choice. Here, I cannot say that Dr. Haller is well-supported by laboratory tests or other corroborating evidence and overturn the ALJ's physical determinations.[14]

### b. The Claimant's Own Subjective Complaints of Pain

Before determining a claimant's RFC, an ALJ must evaluate the claimant's credibility. The *Polaski* standard is the guide in the Eighth Circuit for credibility determinations. It provides, in relevant part:

> The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them. . . . The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1.  the claimant's daily activities;
> 2.  the duration, frequency and intensity of the pain;
> 3.  precipitating and aggravating factors;
> 4.  dosage, effectiveness and side effects of medication;
> 5.  functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

---

[14]However, I note that later in this Memorandum and Order I direct that, upon remand, Ms. Jones's credibility is to receive a more detailed analysis consistent with Eighth Circuit case law. If, pursuant to that analysis, she is found to be more credible, Dr. Haller's opinions should also be re-examined.

*Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1986);[15] *see* 20 C.F.R.   §  404.1529;

*Anderson v. Barnhart*, 344 F.3d 809, 814 (8th Cir. 2003).  Deference is generally granted

to an ALJ's determination regarding the credibility of a claimant's testimony and, in

particular, subjective complaints of pain.  *Dunahoo v. Apfel,* 241 F.3d 1033, 1038 (8th Cir.

2001) (stating that if an ALJ provides a "good reason" for discrediting claimant's credibility,

deference is given to the ALJ's opinion, although each factor may not have been

discussed); *Anderson,* 344 F.3d at 814.

---

[15]Social Security Ruling 96-7p provides that a "strong indication" of the credibility of a
claimant's statements is the consistency of the claimant's various statements and the
consistency between the statements and the other evidence in the record.  Ruling 96-7p
provides that the ALJ must consider such factors as:

> * The degree to which the individual's statements are consistent with the medical
> signs and laboratory findings and other information provided by medical sources,
> including information about medical history and treatment.

> * The consistency of the individual's own statements. The adjudicator must
> compare statements made by the individual in connection with his or her claim
> for disability benefits with statements he or she made under other
> circumstances, when such information is in the case record. Especially important
> are statements made to treating or examining medical sources and to the "other
> sources" defined in 20 CFR 404.1513(e) and 416.913(e). However, the lack of
> consistency between an individual's statements and other statements that he or
> she has made at other times does not necessarily mean that the individual's
> statements are not credible. Symptoms may vary in their intensity, persistence,
> and functional effects, or may worsen or improve with time, and this may explain
> why the individual does not always allege the same intensity, persistence, or
> functional effects of his or her symptoms. Therefore, the adjudicator will need to
> review the case record to determine whether there are any explanations for any
> variations in the individual's statements about symptoms and their effects.

> * The consistency of the individual's statements with other information in the
> case record, including reports and observations by other persons concerning the
> individual's daily activities, behavior, and efforts to work. This includes any
> observations recorded by SSA employees in interviews and observations
> recorded by the adjudicator in administrative proceedings.

SSR 96-7p, 1996 WL 374186 (S.S.A.) at *5 (July 2, 1996).

In the Eighth Circuit, if an ALJ is going to discount a claimant's subjective complaints of pain, the *Polaski* factors must be acknowledged and considered. *Eichelberger*, 390 F.3d at 590. This does not mean that an ALJ needs to discuss explicitly each *Polaski* factor. *Id.* (citing *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004)). Further, it is only the *factors* that the ALJ needs to acknowledge and consider, and the ALJ does not need to mention specifically the *Polaski* case. *See Randolph v. Barnhart*, 386 F.3d 835, 842 (8th Cir. 2004) (comparing the *Polaski* factors to 20 C.F.R. §§ 404.1529(c)(3)(i)–(vi), (vii), & 416.929(c)(3)(i)–(iv), (vii), and noting that "the ALJ reviewed [the claimant's] testimony in light of the applicable regulations which largely mirror *Polaski*"). An ALJ must make an express credibility finding and give the reasons for discrediting the testimony, *Hall v. Chater*, 62 F.3d 220, 223 (8th Cir. 1995), but as long as an ALJ acknowledges the proper regulations and evidences the requisite factors' consideration, *Polaski* is satisfied.

In this case, the ALJ acknowledged both of the applicable regulations - 20 C.F.R. § 404.1529 and 20 C.F.R. § 416.929 - and made an express credibility determination to give less than full credit to Ms. Jones's subjective complaints of pain. However, this credibility analysis lacks even a cursory discussion of most of the factors *Polaski* directs that an ALJ must consider. In other words, while seemingly acknowledged, it is difficult to conclude that the requisite factors were in fact appropriately considered.

For example, I note that Ms. Jones has an extensive medication history, treating both her mental and physical conditions. However, nowhere in the ALJ's findings (other than a passing reference to the applicable regulations), does he evidence consideration

21

of her medication history, and certainly does not detail her prescription record, how helpful the medications are in treatment of her symptoms, and any side effects she feels as a result of taking the medications.

In fact, the only *Polaski* factor specifically articulated in the ALJ's findings is the factor relating to the claimant's daily activities.  I do not find that this deficiency alone is sufficient to persuade me that the ALJ's credibility finding is unsupported by substantial evidence on the record.  However, upon remand, if the ALJ wishes to reject Ms. Jones's subjective complaints of pain, that ALJ is instructed to conduct a more thorough *Polaski* analysis.  This analysis should specifically set out all of the applicable factors as they relate to Ms. Jones.

IT IS ORDERED:

1.    The findings and conclusions of the Commissioner are reversed; and

2.    The matter is remanded back to the Social Security Administration for further proceedings consistent with this Memorandum and Order.

DATED this 15th day of November, 2006.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge